62UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JANE LOUISE SCOTT,

                Plaintiff,

      -vs-

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

               Defendant.

_____

**DECISION AND ORDER**
**No. 13-CV-6277(MAT)**

## INTRODUCTION

      Plaintiff, Jane Louise Scott ("Plaintiff" or "Scott"), brings this action under Title XVI of the Social Security Act ("the Act"), claiming that the Commissioner of Social Security ("Commissioner" or "Defendant") improperly denied her application for Supplemental Security Income ("SSI").

      Currently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I grant the Commissioner's motion, deny the Plaintiff's motion, and dismiss the Complaint.

## PROCEDURAL HISTORY

      On March 12, 2010, Plaintiff filed an application for SSI, alleging disability as of June 13, 2009, which was denied. Administrative Transcript [T.] 65-67, 171-181.  A hearing was held on October 12, 2011 before administrative law judge ("ALJ") John P. Costello, at which Plaintiff, with a non-attorney representative,

appeared and testified, as did a vocational expert ("VE"). T. 29-63. On October 26, 2011, the ALJ issued a decision finding that Plaintiff was not disabled from March 12, 2010 to October 26, 2011. T. 10-21.

On April 3, 2013, the Appeals Councils granted Plaintiff's request for review, and adopted the findings and conclusions of the ALJ, making the decision of the Appeals Council the final decision of the Commissioner. T. 4-17, 166-170. This action followed.

## FACTUAL BACKGROUND

Plaintiff, who was age 45 at the time of the hearing, testified that she receives financial assistance from Social Services and lives with her two sons, ages 27 and 16. T. 32-33. Plaintiff testified she is unable to work because of various physical and mental health problems, but that her mental problem is worse. T. 34.

**Medical Evidence Before March 12, 2010**

Plaintiff received outpatient mental health treatment in 2008 and 2009 at St. Mary's Mental Health Outpatient Clinic ("St. Mary's"). T. 261-286. Treatment notes show that Plaintiff was diagnosed with bipolar disorder, cocaine dependence in full remission, alcohol dependence, and cannabis dependence in early remission. T. 262. She was prescribed various psychotropic medications from her primary care physician. T. 286.

In May 2009, psychologist Maryanne G. Hamilton, Ph.D. performed a mental consultative examination. T. 296-300.

Dr. Hamilton diagnosed Plaintiff with bipolar disorder, panic disorder, cocaine dependence in early remission, cannabis abuse, and alcohol dependence in remission. T. 298-299. She noted that Plaintiff's cognitive functioning was average and assessed that Plaintiff could follow and understand simple directions, perform simple tasks independently, and maintain attention and concentration. T. 298.

Also in May 2009, Karl Eurenius, M.D. diagnosed Plaintiff with chronic low back pain with some neuropathic symptoms, bilateral knee pain, substance abuse, and diet-controlled diabetes mellitus. T. 304. According to Dr. Eurenius, Plaintiff was "moderately limited in walking more than [a] 1/4 of a mile, climbing more than 1 flight of stairs, bending, lifting more than ten pounds, carrying more than ten pounds, or kneeling due to a combination of chronic knee and back pain." T. 304.

In June 2009, State Agency psychologist M. Morog reviewed the evidence in the file and concluded that, "[w]hen the record is considered as a whole, the claimant merits a severe psychiatric diagnosis that causes mild to moderate impairment in adaptive and functional abilities." Dr. Morog predicted that with ongoing treatment, Plaintiff's symptoms would improve. T. 321. In June and July 2009, Plaintiff was seen at Unity Family Medicine at St. Mary's, complaining of high blood pressure in June and nasal and chest congestion in July. No significant findings were made at either visit. T. 440-445.

-3-

From October 2009 to February 2010, Plaintiff was seen at Westside Health Services for, among other things, leg and back pain. In October, she was diagnosed with hypertension, anxiety and myalgia. T. 358-359. In November, she was diagnosed with hypertension, peripheral neuropathy, tinea corporis, and insomnia. T. 361-362. In February 2010, Plaintiff complained of continued back pain and a possible kidney infection. T. 348-349. Upon examination, Plaintiff was diagnosed with low back pain and was given pain medication. T. 348-349.

**Medical Evidence from March 12, 2010 to October 26, 2011**

On March 22, 2010, Plaintiff was seen at Westside for a sleep prescription refill, reporting that her lower back pain had improved. T. 346. Plaintiff was diagnosed with insomnia, peripheral neuropathy, and hypertension and advised to follow-up in four weeks. T. 346-347.

On July 7, 2010, Plaintiff was seen at St. Mary's by LMSW Mary L. LoVerdi, complaining of anxiety, panic attacks, paranoia, and mood swings. T. 374-382. LoVerdi noted that Plaintiff had a history of anger management and that Plaintiff "chose jail instead of anger management group." T. 381. She reported that Plaintiff presented with symptoms of anxiety and depression and added a diagnosis of panic disorder with agoraphobia. T. 381. Plaintiff was seen at St. Mary's again on July 22, 2010, complaining of anxiety panic attacks, paranoia, mood swings, insomnia and irritability. T. 265. LoVerdi reported Plaintiff's mental health

symptoms as "depression, mania" and noted that Plaintiff's response to mental health treatment was positive.  T. 366.  At that time, LoVerdi assessed Plaintiff a Global Assessment Functioning ("GAF") score of 58.  T. 364.

In July 2010, consultative psychologist Dr. Christine Ransom performed a psychiatric examination of Plaintiff.  T. 383-386. Dr. Ransom diagnosed Plaintiff with "bipolar disorder, currently moderate to marked," back and knee pain, left shoulder pain, and high blood pressure.  T. 386.  Dr. Ransom opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for tasks, maintain a regular schedule and learn simple tasks.  T. 385.  Dr. Ransom also assessed that Plaintiff would have "moderate-to-marked" difficulty performing complex tasks independently, relating adequately with others and appropriately dealing with stress due to her bipolar disorder.  T. 385. Plaintiff's prognosis was assessed as fair to good with consistent treatment.  T. 386.

In July 2010, Harbinder Toor, M.D. performed a physical consultative examination of Plaintiff.  T. 387-390.  Dr. Toor diagnosed a history of knee pain, balancing problems, back pain, left shoulder pain, depression, anxiety, mood swings, and hypertension.  T. 389-390.  Dr. Toor assessed that Plaintiff had "moderate to severe limitation" in standing, walking, squatting, or heavy lifting due to pain in the knees and back.  He also assessed

"mild limitation" in reaching, pushing, and pulling with the left shoulder.  T. 390.  He recommended that Plaintiff be evaluated by a psychologist or psychiatrist for her mental problems, but "[n]o other medical limitations [were] suggested by [his] evaluation." T. 390.

In August 2010, psychologist Thomas Harding reviewed the evidence in the file and opined that Plaintiff showed mild limitation in activities of daily living, moderate limitations in social functioning and concentration, persistence or pace, and had no episodes of decompensation.  Dr. Harding summarized the evidence in the file, noting Plaintiff's history of multiple chemical dependency episodes in the past.  Dr. Harding reported that Plaintiff was cooperative but "moderately to markedly irritable and socially inappropriate during the evaluation."  Dr. Harding reported that Plaintiff's thought processes were "notable for lack of coherence and goal directedness," and that her mood and affect, attention and concentration, and memory were moderately to markedly impaired. T. 391.

In a Monroe County Department of Human Services Physical Assessment for Determination of Employability form dated January 5, 2011, LMSW LoVerdi reported that she had seen Plaintiff from July to December 2010 at St. Mary's and opined that Plaintiff would be unable to partake in "activities" for a 12-month period due to a history of substance abuse, anxiety and panic disorders.  T. 519, 520.

In January 2011, Plaintiff was seen by Amanat Yosha, M.D., who referred her to an orthopedic surgeon for possible tears in the miniscus of her knee.  T. 482-483.    In March 2011, Plaintiff was seen at the University of Rochester Medical Center ("URMC"). Gregg Nicandri, M.D. reviewed an MRI of Plaintiff's knee and determined that Plaintiff had a lateral meniscus tear accompanied with moderate knee joint effusion and degenerative changes.  Upon examination, Plaintiff showed tenderness at the lateral joint line and a positive McMurray's sign.  Dr. Nicandri referred her for knee surgery, which she underwent on March 28, 2011.  In April 2011, Plaintiff returned to URMC, and treatment notes show that Plaintiff was progressing well and was not taking any narcotic pain medication.  Dr. Nicandri recommended physical therapy.  T. 424, 428-429.

In August and September 2011, Plaintiff returned to St. Mary's for mental health treatment.  T. 517.  At both times, Plaintiff's GAF was assessed at 53, and no other significant changes in her mental health were reported.  T. 511-512, 499, 503, 498.

On September 30, 2011, Plaintiff returned to Dr. Yosha for follow-up with respect to her knee surgery.  T. 490-491.  Dr. Yosha noted that Plaintiff reported falling down the stairs three days prior and had gone to the hospital and was discharged with a leg brace.  Upon examination, Plaintiff's right knee showed joint swelling and tenderness along the lateral joint and posterior knee. Dr. Yosha assessed knee pain, hypertension and bipolar disorder.

For her knee pain, Dr. Yasha recommended NSAIDS and Tylenol. T. 490.

**The VE's Testimony**

At the hearing, the ALJ asked the VE whether work existed that an individual with Plaintiff's vocational profile could perform, assuming the individual could perform light work with occasional balancing and who was further limited to simple and repetitive tasks, no interaction with the general public, and only occasional interaction with coworkers.  T. 60.  The VE testified that there existed jobs in the national economy that such an individual could perform, including collator operator and laundry sorter.  T. 60.

## DISCUSSION

### I. Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405 (g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)(2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Section 405 (g) limits the scope of the Court's review to two inquiries: determining whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Mongeur, 722 F.2d at 1038 (finding a reviewing court does not try a benefits case de novo).

Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). A party's motion will be dismissed if, after a review of the pleadings, the Court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## II. The Commissioner's Decision Denying Plaintiff Benefits is Supported by Substantial Evidence in the Record

The Social Security Administration has promulgated a five-step sequential analysis that the ALJ must adhere to for evaluating disability claims. 20 C.F.R. § 404.1520. In this case, the ALJ applied this five-step sequential process and found that: Plaintiff did not engage in substantial gainful activity from

March 12, 2010 to October 26, 2011;  that Plaintiff had the severe impairments of bipolar disorder, anxiety disorder, bilateral knee dysfunction status post arthroscopic surgery on the right, obesity, and chronic back pain, but that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments; that Plaintiff had no past relevant work experience, but that she had the residual functional capacity ("RFC") to perform light work except that she can perform occasional balancing and should have no interaction with the general public and occasional interaction with co-workers; and that, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform.

Therefore, the ALJ determined that Plaintiff was not disabled under the Act from March 12, 2010 to October 26, 2011.  The Appeals Council modified the ALJ's RFC finding to accurately reflect the hypothetical posed by the ALJ to the VE by including that Plaintiff be additionally restricted to "simple and repetitive tasks," and otherwise adopted the ALJ's findings and conclusions of law.  T. 5-6.

## III. Analysis of Plaintiff's Arguments

### A.   ALJ Failed to Properly Weigh Opinion Evidence

Plaintiff argues that the ALJ failed to follow the appropriate legal standards when evaluating the consultative opinions in the

record, and ignored the opinion of treating therapist LoVerdi.  In addition, Plaintiff claim that "the ALJ relied upon the absence of opinion evidence to discount Plaintiff's limitations and credibility, and the ALJ failed to meet his duty to develop the record." Dkt. No. 10-1 at 14.  The Court finds these arguments meritless for the reasons discussed below.

### (1)  LMSW LoVerdi's Opinion

Plaintiff argues that "[t]he ALJ did not cite, weigh, or evaluate the opinion of treating therapist LoVerdi.  The ALJ was required to evaluate the opinion, and the failure to do so is error." Dkt. No. 10-1 at 15; see also Pl's Response (Dkt. No. 14) at 2.

Where, as here, "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not  required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Barringer, 358 F. Supp. 2d at 79 (citing Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir.1983)).  Although the ALJ did not explicitly discuss the opinion of LMSW Loverdi in his decision, he did discuss and cite to the evidence pertaining to Plaintiff's mental health history, which includes the treatment notes from LoVerdi's practice at St. Mary's Outpatient Clinic.  T. 5-6, 18, 261-286, 340-344, 374-382, 452-462, 492-493.

The Court also rejects Plaintiff's related argument that the ALJ should have "giv[en] weight" to Loverdi's opinion because she

"is a specialist and has a [treating] relationship with Plaintiff."
Dkt. No. 10-1 at 16.  The Regulations provide that, social workers,
like LoVerdi, are not acceptable medical sources.  20 C.F.R. §§
416.902, 416.927(d).  "[O]nly 'acceptable medical sources' can be
considered treating sources . . . whose medical opinions may be
entitled to controlling weight."  SSR 06-3p, 2006 SSR LEXIS 5.

In any event, to the extent LoVerdi's January 5, 2011 opinion
that Plaintiff "is unable to participate in activities except
treatment or rehabilitation" for 12 months can be construed as a
statement that Plaintiff is disabled, such a statement is on an
issue that is reserved for the Commissioner.  See 20 C.F.R. §§
404.1527(e), 416.927(e).

**(2)  The Opinions of the Consultative Physicians**

Plaintiff argues that the ALJ failed to evaluate the opinions
of the consultative physicians pursuant to the factors required
under 20 C.F.R. § 416.927, and failed to provide sufficient
rationale for the weight afforded to them.  Dkt. No. 10-1 at 17.

To determine the weight given to a physician's medical
opinion, the ALJ must consider the following factors:  (1) whether
there was a treatment relationship; (2) the length, frequency,
nature, and extent of the treatment relationship; (3) whether the
relationship is supported by medical and laboratory findings; (4)
the consistency of the opinion with the record as a whole; (5)
whether the physician is specialized; and (6) any other relevant
factors.  See 20 C.F.R. §§ 416.927 (d)(3)-(6), 416.1527(d)(3)-(6).

-12-

In this case, the ALJ afforded "limited weight" to the opinions of Drs. Hamilton and Harding and "significant weight" to the opinions of Drs. Morog, Ransom, Eurenius and Toor. T. 18-20. The Court finds that the ALJ properly evaluated their opinions and that his findings are supported by substantial evidence. With respect to the opinions of Drs. Hamilton and Harding (related to Plaintiff's mental health), the ALJ properly afforded them "limited weight" as they were internally inconsistent in various respects and also inconsistent with the record as a whole. T. 18. For instance, as the ALJ noted, Dr. Hamilton reported that Plaintiff "drinks a six pack of beer a week," but also reported that Plaintiff's alcohol dependence was in remission. T. 18. Similarly, Dr. Harding opined that Plaintiff had "moderate to marked limitations" in various areas of functioning as a result of her bipolar disorder and anxiety. Yet, Dr. Harding also reported that Plaintiff was prescribed medications from her primary care physician and that these medications were effective in helping to manage her condition. T. 409.

Further, the ALJ properly discounted the opinions of Drs. Hamilton and Harding to the extent they were inconsistent with the record as a whole, which showed overall that while Plaintiff's bipolar disorder and her anxiety interfered with her ability to perform certain work activities, her impairments did not prevent her from performing all types of work. See generally Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (when an opinion is

inconsistent with other substantial evidence, the Commissioner is not required to afford deference to that opinion, and may use discretion in weighing the medical evidence as a whole).

With respect to State Agency Medical consultant Dr. Morog and consultative examiner Dr. Ransom, the ALJ reasonably afforded these opinions "significant weight" as they were consistent with other evidence in the record. Specifically, Dr. Morog opined that Plaintiff's mental issues "mildly to moderately" impaired her, and that her symptoms responded to treatment in the past. Likewise, Dr. Ransom opined that Plaintiff could follow, understand and perform simple tasks, maintain attention and concentration for tasks, maintain a regular schedule and learn simple tasks. T. 385. These opinions were supported by and consistent with the longitudinal evidence related to Plaintiff's mental health history, including her treatment history, which showed that her bipolar disorder and anxiety were sufficiently managed with properly-attended therapy and appropriate medications and did not prevent her from working altogether. T. 19, 262-295, 339-344, 363-382, 452-472, 498-518.

Finally, the Court finds no merit to Plaintiff's argument that the ALJ erred in evaluating the opinions of consultative examiners Eurenius and Toor with respect to Plaintiff's physical impairments. Plaintiff argues that the ALJ erred in relying on these opinions because they were issued prior to Plaintiff's March 2011 knee surgery. However, the ALJ specifically noted this in his decision

(T. 20), and modified Plaintiff's RFC accordingly to include an exception for "occasional balancing" to reflect Plaintiff's improved physical condition following her knee surgery.  T. 17.

### (3)   The ALJ's Duty to Request Clarification from Drs. Toor, Eurenius and Hamilton

Plaintiff argues that the ALJ has an affirmative obligation to develop the administrative record, Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks and citations omitted);  however, this duty is not without limit.  See Guile v. Barnhart, No. 5:07-cv-259, 2010 U.S. Dist. LEXIS 58423, 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010).  If all of the evidence in the record is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and the ALJ may make his determination based upon that evidence.  See 20 C.F.R. § 416.920b(a).  Consistent with that notion, where, as here, there are no "obvious gaps" in the record, the ALJ is not required to seek additional information. Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

In this case, the ALJ had before him Plaintiff's medical records, including treatment records from prior to and during the relevant time period.  The ALJ also had before him the opinions of numerous consultative physicians, all of whom addressed either Plaintiff's mental or physical limitations.  Nonetheless, Plaintiff faults the ALJ for failing to request updated opinions from Drs. Eurenius and Toor since their respective opinions were issued prior

to Plaintiff's 2011 knee surgery.  The Court finds no merit to this argument because, in determining Plaintiff's RFC, the ALJ also had before him the treatment notes from Plaintiff's orthopedic surgeon post-dating Plaintiff's knee surgery, which showed improvement in her condition.  Notably, Dr. Nicandri did not assess any additional physical restrictions.  Moreover, the record fails to disclose any critical gaps with respect to Plaintiff's knee impairment sufficient to trigger the ALJ's duty to further develop or clarify the record.

Plaintiff also argues that the ALJ was duty-bound to re-contact consultative examiner Dr. Hamilton to explain the "alleged internal inconsistency" (discussed above) in her opinion.  Dkt. No. 10-1 at 21-22;  see also Dkt. No. 14 at 3.  There is, however, no requirement that ALJs recontact consultative examiners.  Rather, the Regulations address recontacting a claimant's treating sources. See 20 C.F.R. §§ 404.1512(e), 416.912(e).  Moreover, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002), and the ALJ acted within his discretion by affording Dr. Hamilton's opinion "little weight" based on all of the evidence before him at the time of his decision.

### B.   ALJ's RFC Finding is Flawed

Plaintiff claims that the ALJ's RFC finding is flawed because the ALJ failed to state with specificity how the medical evidence supports his RFC finding, and because the ALJ was duty-bound to

request a more detailed medical opinion with respect to Plaintiff's physical RFC.  Dkt. No. 10-1 at 22.

What an individual "can still do despite his or her limitations" is the RFC and is, ordinarily, the "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 SSR LEXIS 5, *1, 1996 WL 374184, at *2 (SSA July 2, 1996)).

In making an RFC determination, the ALJ must "consider[ ] all relevant evidence, consisting of, inter alia, physical abilities, symptoms including pain, and descriptions, including that of the claimant, of limitations which go beyond symptoms."  Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing 20 C.F.R. §§ 404.1545, 416.945).  A claimant's physical abilities are determined by evaluating his exertional and nonexertional limitations in performing a certain category of work activity on a regular and continuing basis. Id. (citing 20 C.F.R. §§ 404.1545, 416.945, 404.1567, 404.1569a, 416.967, 416.969a).

However, as discussed above, in arriving at his disability determination, an administrative judge is not required to

explicitly name and discuss every piece of evidence in the record. See Berry, 675 F.2d at 469; Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981); Barringer v. Commissioner of Social Sec., 358 F.Supp.2d 67, 78-79 (N.D.N.Y. 2005).

Here, the Commissioner determined that Plaintiff has the RFC to perform light work, "except [that] she can perform occasional balancing, [is] limited to simple repetitive tasks, no interaction with the general public and occasional interaction with co-workers." T. 17, 6. This determination is supported by substantial evidence in the record.

Specifically, Plaintiff's mental RFC is supported by the opinions of consultative physicians Drs. Ransom and Morog. T. 5-6, 18-19. Indeed, the opinions of consultative and State Agency physicians can constitute substantial evidence where, as here, the opinions are consistent with the other evidence in the record. See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Mongeur, 722 F.2d at 1039 (2d Cir. 1983) (citations omitted). Here, Dr. Ransom performed a consultative examination of Plaintiff on July 23, 2010 and reported that Plaintiff was "moderately to markedly irritable and socially inappropriate during the evaluation setting frequently becoming argumentative." T. 384. Dr. Ransom reported further that Plaintiff's speech was intelligible and fluent, her train of thought was difficult to follow, and lacked coherence and goal direction. Plaintiff's attention and concentration and her

immediate memory skills were "moderately to markedly impaired." Dr. Ransom also reported that Plaintiff had a clear sensorium, was fully oriented, her intellectual functioning appeared to be average, her judgment and insight were good, and her general fund of information was appropriate to her experience.   T. 385. Dr. Ransom diagnosed "bipolar disorder, currently moderate to marked," and assessed that Plaintiff faced moderate to marked difficulties with performing complex tasks independently, relating adequately with others, and appropriately dealing with stress. T. 385.  Dr. Ransom also opined that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for tasks, maintain a regular schedule and learn simple tasks.  T. 385.

Additionally, on June 5, 2009, State Agency medical consultant Dr. Morog reviewed the evidence in the file and assessed that Plaintiff showed mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, no difficulties with concentration, persistence or pace, and had experienced no episodes of decompensation.  T. 319, 207-318, 319-326.  Dr. Morog assessed that Plaintiff showed mild to moderate impairment in adaptive and functional abilities, and would respond favorably to ongoing treatment and sobriety.  T. 321.

The opinions of Drs. Ransom and Morog were consistent with and supported by the other evidence in the record, which showed that

Plaintiff suffered from bipolar disorder and anxiety, but also had repeated mental examinations revealing few functional limitations. Additionally, the evidence in the record showed that Plaintiff's mental health treatment was generally conservative, was managed with medication and therapy, and that she was repeatedly assessed GAF scores ranging from 53-58.[1]  T. 494-495, 498, 506, 516-517.

Similarly, the ALJ's physical RFC finding is supported by substantial evidence.  "[L]ight work" is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967©.  In arriving at his determination that Plaintiff maintained the physical RFC to perform light work "except that she can perform occasional balancing," the ALJ discussed the objective evidence in the record related to Plaintiff's knee and back impairments and her obesity.  First, the ALJ pointed out that an X-ray of the knees taken in July 2009 was within normal limits, although an MRI of the right knee taken in December 2010 revealed moderate size knee joint effusion, a septet

---

[1]
A GAF of 51 to 60 signifies some moderate symptoms or moderate difficulty in social, occupational or school functioning.  See Diagnostic and Statistical Manual of Mental Disorders-IV-TR, Front Matter, Multiaxial Assessment (2000 ed.).

Baker's cyst, a meniscus tear and degenerative changes.  The ALJ noted, however, that athroscropic surgery was performed on the right knee on March 28, 2011, which resulted in improvement.  With respect to her lower back pain, the ALJ pointed out that said pain appeared sporadic since her treatment notes reflect "numerous occasions on which the claimant did not specify any particular complaint."  T. 19.  The ALJ also addressed Plaintiff's obesity, and its effect on her knee impairment.  He noted that although Plaintiff alleged knee pain and testified that she used a cane for balance at home, the record showed that Plaintiff had significant improvement in her right knee since her surgery.  He pointed out that treatment notes from Plaintiff's treating orthopedist following her March 2011 surgery showed that she was progressing well and did not need narcotic pain medication.  T. 19.

In arriving at Plaintiff's physical RFC, the ALJ also took into consideration the findings and opinions of consultative examiners Drs. Eurenius and Toor.  As noted by the ALJ, Dr. Eurenius examined Plaintiff in May 2009 and assessed that: Plaintiff appeared in no acute distress and showed a normal gait and stance; she walked on her heels and toes without difficulty; could not squat for more than a quarter of the way down; used no assistive devices; needed no help changing for the examination or getting on and off the exam table; rose from a chair without difficulty; she had full range of motion ("ROM") in her cervical

spine, a slightly limited ROM in her lumbar spine and positive straight leg raising; full ROM in her shoulders, elbows, forearms, wrists, hips, knees and ankles with some pain in the knees; and showed no motor or sensory deficits and had no abnormalities in her extremities outside of tenderness in her knees. T. 302-304. He opined that Plaintiff was moderately limited in walking more than a quarter of a mile, climbing more than one flight of stairs, bending, lifting more than 10 pounds, carrying more than ten pounds, and kneeling. T. 5-6, 20, 304.

Meanwhile, Dr. Toor examined Plaintiff in July 2010, and assessed that: Plaintiff appeared in no acute distress and had a limping gait due to right knee pain; she refused to walk on heels and toes or squat due to the pain; had difficulty getting on and off the exam table and rising from a chair; her stance was normal and she used no assistive device and required no help for changing with the exam; she had full ROM in her cervical spine, limited ROM in her thoracolumbar sine and right knee; single leg raise was positive and she had pain her left shoulder; she exhibited full ROM in her left knee with slight pain; she had no evidence of subluxations, contractures, ankylosis or thickeing and her joints were stable and nontender with no swelling or effusion. Dr. Toor assessed knee pain more severe in the right knee, a history of balancing difficulties, back pain, left shoulder pain, depression, anxiety, mood swings, and hypertension. He therefore opined that

Plaintiff had moderate to severe limitation in standing, walking, squatting, or heavy lifting, and mild limitation in reaching, pushing, and pulling with the left shoulder. T. 20.

The ALJ acknowledged that the opinions of Drs. Eurenius and Toor were rendered prior to Plaintiff's March 2011 knee surgery, after which Plaintiff showed significant improvement.  T. 20. Accordingly, the ALJ took into account Plaintiff's knee surgery in determining that she was capable of performing light work, with the exception that she can perform occasional balancing.

In sum, the Court finds that the ALJ's RFC finding is supported by substantial evidence in the record and is proper as a matter of law.

## C.   The ALJ's Credibility Assessment is Flawed

Plaintiff argues that the ALJ failed to apply the appropriate legal standards in finding Plaintiff not fully credible with respect to her complaints of pain and related symptoms.  Dkt. No. 10-1 at 27.  Specifically, she claims that: (1) the ALJ's comparison to his own RFC finding was inappropriate under the law; (2) the ALJ failed to evaluate Plaintiff's subjective statements pursuant to 20 C.F.R. § 404.1529; (3) the ALJ inaccurately cited Plaintiff's testimony and the medical records; and (4) the ALJ failed to account for Plaintiff's testimony of her functional limitations, which were more limiting than the ALJ's RFC finding.

Dkt. No. 10-1 at 28-30.  The Court finds no merit to Plaintiff's arguments for the reasons set forth below.

In determining whether a claimant is disabled, the Commissioner must consider subjective evidence of pain or disability to which the claimant testifies, but "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citations omitted). The Social Security regulations set forth a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such symptoms, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. § 404.1529©.

"[T]o the extent that the claimant's [symptom] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii). That credibility inquiry involves consideration of seven factors: (1) the claimant's daily

activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  See 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In his decision, the ALJ stated that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her statements concerning the intensity, persistence and limiting effects of her symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." T. 18.  In particular, the ALJ pointed out that none of Plaintiff's treating physicians recommended restrictions with respect to her functional abilities, and that her treatments were generally conservative/routine in nature.  T. 20.

Plaintiff argues that the ALJ's RFC finding is flawed because the ALJ improperly engaged in a credibility assessment calculated to conform to his own RFC determination.  Dkt. No. 10-1 at 28. Indeed, the Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a

credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding. See, e.g., Smollins v. Astrue, No. 11-CV-424, 2011 U.S. Dist. LEXIS 98257, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011) ("[the ALJ's] analysis of Smollins's credibility is flawed not only in its brevity, but also in its acceptance as a foregone conclusion of Smollins's capacity to perform sedentary work. Instead of comparing Smollins's symptoms, as described by Smollins herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the ALJ] merely compared Smollins's statements regarding her symptoms to his own RFC assessment."); see also Ubiles v. Astrue, 11-CV-6340TMAT, 2012 U.S. Dist. LEXIS 100826, 2012 WL 2572772 (W.D.N.Y. July 2, 2012); Mantovani v. Astrue, No. 09-CV-3957, 2011 U.S. Dist. LEXIS 35001, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011). Here, however, the ALJ properly went on to analyze Plaintiff's credibility by comparing aspects of her testimony to the record evidence.

First, the ALJ compared Plaintiff's complaints of disabling mental health issues with the evidence related to her mental health history, including her treatment. He noted that Plaintiff's complaint that she suffered from a disabling mood disorder throughout her life was contradicted by the evidence in the record which showed that she did not seek treatment until she was an adult. The ALJ also pointed out that Plaintiff's allegation that

she had stopped using illicit drugs was contradicted by the evidence in the record showing that Plaintiff had a long history of substance abuse and had been in multiple chemical dependency treatment programs. Additionally, the ALJ acknowledged that while Plaintiff claimed she was unable to use public transportation because she had anger management issues and was afraid she would hurt someone if provoked, the record evidence showed that she maintained relationships with her children and grandchildren, occasionally went to church, and was able to control her anger in all of these situations. Additionally, the ALJ pointed out that Plaintiff testified that she also maintained a 27-year relationship with her girlfriend. T. 18.

The ALJ also compared Plaintiff's complaints of disabling bilateral knee pain with the related evidence in the record and pointed out that while Plaintiff alleged her knee pain was a "12 out of 10" in intensity, she also testified that the pain was temporarily relieved with pain medication. The ALJ acknowledged that although the diagnostic testing performed on Plaintiff's right knee in December 2010 revealed moderate size knee joint effusion, a septet Baker's cyst, a meniscus tear and degenerative changes, Plaintiff underwent surgery in March 2011, which resulted in noted improvement. The ALJ also pointed out that Plaintiff herself testified at the hearing that she was essentially pain free in her right knee. T. 18, 50-51.

With respect to Plaintiff's low back pain, the ALJ compared Plaintiff's complaints of ongoing, disabling symptoms with the relevant evidence in the record.  Specifically, he pointed out that while Plaintiff alleged a persistent and debilitating condition, treatment notes from her office visits reflected numerous occasions on which she did not specify any particular back-related complaints.  He also noted that while Plaintiff reported increased back pain in October 2009, she also reported being out of her pain medication at that time.  He noted further that it was not until February 2010 that Plaintiff reported back pain again, but acknowledged that she believed said pain was related to a kidney infection.  T. 19.

Finally, the ALJ discussed Plaintiff's statements with respect to her obesity.  T. 19.  The ALJ acknowledged the evidence showing that Plaintiff is obese, and that Plaintiff testified to using a cane for balancing at home.  T. 19.  However, as the ALJ pointed out, the evidence post-dating Plaintiff's March 2011 surgery showed that Plaintiff had significant improvement in her right knee, and she reported only having moderate pain in her left knee.  T. 19.

Accordingly, given these inconsistencies in Plaintiff's statements, the ALJ found that Plaintiff "has not been entirely candid" (T. 20), and reasonably determined that Plaintiff's statements were not fully credible.  The Court therefore finds that

the ALJ's credibility assessment is proper as a matter of law and is supported by substantial evidence.

### CONCLUSION

The Commissioner's Motion for Judgment on the Pleadings is granted (Dkt. No. 13), the Plaintiff's motion is denied (Dkt. No. 10), and the Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge


DATED:    June 23, 2014
          Rochester, New York